IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

MCCLURE V. MCCLURE

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

PATRICK MCCLURE, APPELLEE,

V.

SHERILYN MCCLURE, ALSO KNOWN AS SHERILYN MILLS-MCCLURE, APPELLANT.

Filed March 6, 2018.    No. A-17-664.

Appeal from the District Court for Hall County: JOHN H. MARSH, Judge. Affirmed.

Mark Porto, of Porto Law Office, for appellant.

Andrew D. Hanquist, of Bradley Law Office, P.C., for appellee.

PIRTLE, BISHOP, and ARTERBURN, Judges.

BISHOP, Judge.

Sherilyn McClure, also known as Sherilyn Mills-McClure (now known as Sherilyn Mae Mills), appeals from the Hall County District Court's decree dissolving her marriage to Patrick McClure. Sherilyn challenges the district court's decision awarding primary physical custody of the parties' two minor children to Patrick and refusing to allow the minor children to testify at trial. We affirm.

BACKGROUND

Sherilyn was previously married and had three children from that marriage, Harrison (18), Riley (13), and Griffin (10) (ages at time of trial). Sherilyn's former husband passed away in January 2008. Sherilyn was living in the state of Washington at the time, and in February 2009, she moved to Nebraska. Sherilyn and Patrick were married in July 2010. In May 2011, Dillen (born in August 2007) and Colten (born in November 2008), came to live with Sherilyn and Patrick; Sherilyn and Patrick adopted the boys in December 2011. Dillen and Colten are the

- 1 -

biological children of Sherilyn's brother, Marcus Checketts, who had been living in Utah but subsequently moved to Nebraska sometime after the adoption. In late March 2012, Sherilyn informed Patrick she wanted a divorce. In June, she left for Kennewick, Washington, and took her three biological children with her. Dillen and Colten remained with Patrick. Sherilyn did not return until March 2013; she stayed in Nebraska until June 2014, at which time she returned to Washington. Dillen and Colten again remained with Patrick in Nebraska.

Patrick filed a complaint to dissolve the marriage of the parties on July 22, 2014, and simultaneously filed a motion for temporary custody and an application for ex parte temporary custody of Dillen and Colten. Patrick claimed Sherilyn had moved to Washington on approximately June 8, thereby leaving the children with Patrick in Grand Island, Nebraska. He claimed Sherilyn was flying back to Nebraska and he was concerned she might take the children back to Washington with her. An ex parte order was entered sustaining the application the same day.

On January 2, 2015, Sherilyn filed an "Answer and Application to Remove Minor Children from the State of Nebraska." Sherilyn alleged she should have custody of the children; Sherilyn stated she lived in Washington and that she should be granted permission to permanently move the children there.

An order in response to both parties' motions for temporary orders was entered on June 18, 2015, and amended on June 24; in relevant part, it granted temporary legal and physical custody of Dillen and Colten to Patrick, and Sherilyn was ordered to pay $307 per month for child support.

Sherilyn filed a motion for an ex parte custody order on January 4, 2016. She asserted that she had obtained a protection order and custody of the children in Washington as a result of Patrick assaulting her when he was there in December 2015. (Patrick had taken the children to Washington to visit her.) On January 10, 2016, Sherilyn requested leave to file an additional motion for temporary orders regarding custody, parenting time, and child support. On January 26, Patrick filed for a show cause order, claiming Sherilyn failed to return to the children to Nebraska after her Christmas parenting time. An order to show cause issued that same day. Sherilyn returned to Nebraska and has lived here since January 2016. An order entered by the court on June 1 denied Sherilyn's "Motion for Modification of a Temporary Custody Order"; the order indicated the court was reluctant to modify temporary orders "in all but the most extreme cases" in order to avoid interjecting "even more instability and uncertainty into the lives of all parties concerned."

Trial took place on May 17, 2017. A decree dissolving the marriage was entered on June 27. In relevant part, the court awarded the parties joint legal custody of Dillen and Colten, with primary physical custody awarded to Patrick. Sherilyn's parenting time consisted of every other weekend from after school Wednesday to 8 a.m. or "before school" the following Monday, as well as every Wednesday from after school until 8 a.m. or "before school" on Thursday. Holidays were divided between the parties, and Sherilyn was also provided summer parenting time every week from Wednesday morning until Sunday morning. Sherilyn was ordered to pay child support of $45 per month for the parties' two children.

Sherilyn appeals.

ASSIGNMENTS OF ERROR

Sherilyn assigns the district court erred by (1) awarding primary physical custody of the minor children to Patrick and (2) refusing to allow the minor children to testify.

STANDARD OF REVIEW

In actions for dissolution of marriage, an appellate court reviews the case de novo on the record to determine whether there has been an abuse of discretion by the trial judge. *Coufal v. Coufal*, 291 Neb. 378, 866 N.W.2d 74 (2015). This standard of review applies to the trial court's determinations regarding custody, child support, the division of property, alimony, and attorney fees. *Id.*

Parenting time determinations are also matters initially entrusted to the discretion of the trial court, and although reviewed de novo on the record, the trial court's determination will normally be affirmed absent an abuse of discretion. *Aguilar v. Schulte*, 22 Neb. App. 80, 848 N.W.2d 644 (2014).

An abuse of discretion occurs when a trial court bases its decision upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence. *Flores v. Flores-Guerrero*, 290 Neb. 248, 859 N.W.2d 578 (2015).

A trial court has the discretion to determine the relevancy and admissibility of evidence, and such determinations will not be disturbed on appeal unless they constitute an abuse of discretion. *Gallner v. Larson*, 291 Neb. 205, 865 N.W.2d 95 (2015).

In child custody cases, where the credible evidence is in conflict on a material issue of fact, the appellate court considers, and may give weight to, the fact that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another. *Schrag v. Spear*, 290 Neb. 98, 858 N.W.2d 865 (2015).

ANALYSIS

*Physical Custody.*

When deciding custody issues, the court's paramount concern is the child's best interests. *Citta v. Facka,* 19 Neb. App. 736, 812 N.W.2d 917 (2012). Neb. Rev. Stat. § 43-2923(6) (Reissue 2016) states, in pertinent part:

In determining custody and parenting arrangements, the court shall consider the best interests of the minor child, which shall include, but not be limited to, consideration of the foregoing factors and:

(a) The relationship of the minor child to each parent prior to the commencement of the action or any subsequent hearing;

(b) The desires and wishes of the minor child, if of an age of comprehension but regardless of chronological age, when such desires and wishes are based on sound reasoning;

(c) The general health, welfare, and social behavior of the minor child;

(d) Credible evidence of abuse inflicted on any family or household member. . . ; and

(e) Credible evidence of child abuse or neglect or domestic intimate partner abuse. . . .

Other pertinent factors include the moral fitness of the child's parents, including sexual conduct; respective environments offered by each parent; the age, sex, and health of the child and parents; the effect on the child as a result of continuing or disrupting an existing relationship; the attitude and stability of each parent's character; and parental capacity to provide physical care and satisfy educational needs of the child. *Robb v. Robb,* 268 Neb. 694, 687 N.W.2d 195 (2004).

Sherilyn assigns error to the district court's decision to award Patrick primary physical custody. She correctly notes that appellate courts give great deference to trial courts when reviewing custody decisions. She argues, however, that in this case, "Patrick's documented history of domestic violence," coupled with the children's "significant bond" with Sherilyn, as well as their bond with Sherilyn's other children, should have led to Sherilyn receiving primary physical custody. Brief for appellant at 12.

Sherilyn argues that "[p]erhaps the single biggest problem with the district court's custody determination was its substantial disregard of truly concerning mental and physical abuse that Patrick imposed upon not only Sherilyn, but all of the children who lived in his home." *Id*. at 18. As will be discussed further below, Sherilyn raised three incidents of abuse by Patrick towards her: one occurring in December 2015 in Washington, one in January 2016 when she claimed Patrick caused her to fall down some stairs, and one in April 2016 involving a vehicle exchange. Sherilyn takes issue with the district court only finding one instance of domestic violence to have occurred (January 2016 incident) when there was "ample evidence of numerous other instances of violence." *Id*. at 19. Such evidence is pertinent to the custody factors set forth in § 43-2923(6)(d) and (e) noted above, pertaining to child abuse, neglect, and domestic intimate partner abuse.

In arguing about the evidence relevant to these factors, Sherilyn appears to be asking this court to second guess the district court's findings with regard to conflicting evidence in the record related to the allegations of abuse towards her and the children. As previously stated, in child custody cases, where the credible evidence is in conflict on a material issue of fact, the appellate court considers, and may give weight to, the fact that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another. *Schrag v. Spear, supra*. Bearing that in mind, we first set forth the district court's specific findings related to the allegations of abuse, and then summarize the evidence from trial as to those allegations.

In a "Journal Entry" filed on May 23, 2017, the district court set forth its findings from trial, and stated in relevant part: Sherilyn "left the jurisdiction, taking her three older children with her, leaving the adopted children with [Patrick]"; the first absence in 2012 was for "up to 9 months," and the second absence was from "2014 until January 2016 for a period of up to 15 months. In both cases, the children were adequately cared for by [Patrick]." There were several "physical altercations between the parties," and pursuant to Neb. Rev. Stat. § 43-2932 (Reissue 2016), Patrick, by a preponderance of the evidence, "has committed domestic intimate partner abuse regarding an incident in which [Patrick] caused [Sherilyn] to fall down the stairs and hurt her thumb." Patrick's explanation for this incident was not credible. "The Court does not find that domestic intimate partner abuse occurred regarding the allegations reportedly occurring in Washington in December 2015 or in Hall County [on] April 1, 2016." The court found Patrick's

"bopping" of the children as a disciplinary measure to be inappropriate, but that such conduct did not constitute child abuse or neglect. The court further found that

> the minor children and the other parent can be adequately protected from harm by limitations under the parenting plan as follows:
>
>> Neither parent shall enter the residence of the other parent during the exchange.
>>
>> Both parties are enjoined from assaulting, threatening, imposing any physical restraint on or disturbing the peace of the other party. Both parties shall make reasonable efforts to ensure that any associate such as a significant other or caregiver also refrain from such conduct.

Keeping the district court's findings in mind as set forth above, we now consider the evidence pertaining to allegations of abuse as discerned from our de novo review of the record. With regard to the December 2015 allegations by Sherilyn against Patrick, the record reveals the following. When Patrick took the children to Washington for "Christmas of 2015," there were "complications with the visitation." He testified Sherilyn had inquired several times about "patching our marriage." But at the same time, she still had a boyfriend living with her. Patrick no longer had "any desire to work things out with her." Patrick testified, "On Sunday morning about 5 a.m. she came into my room, crawled into bed with me wanting to be physical with me, and I denied. She got very upset with me." Patrick went to another room until Sherilyn left his room, and then he returned to his room and slept until about 11 a.m. Patrick got dressed and Sherilyn invited him to go to her room to speak about the children. When he went inside her room, Sherilyn shut the door behind him and put her foot in front of the door. She put her hand on the doorknob and asked why Patrick would not leave the children and give her custody. According to Sherilyn's testimony, she had overhead Patrick say that she had given him the boys, so she called him into the room and put her foot up against the door so no one would come in. When she asked him why he would "say that," "that set him off." According to Sherilyn, Patrick took her by the shoulders and "shoved [her] clear across the room in that direction." She fell and hit her head against a nightstand, and then called the police. Patrick presented a different version of what occurred after Sherilyn planted her foot against the door. He testified that Sherilyn grabbed him by his sweatshirt and threw him to the floor. He did believe her head came close to hitting the nightstand "that she has spoke of, but it did not hit the nightstand." He claimed he hollered for help from Sherilyn's boyfriend, and that the boyfriend held Sherilyn back from "being aggressive to me." Patrick said he filled out a police report. No documents are contained in the record related to this matter.

Sherilyn's boyfriend, Alan Isaacson, testified. He was present in the house at the time of the December 2015 incident, but said he did not observe what happened. He claimed, however, that after that incident, Patrick admitted he had previously punched Sherilyn in the stomach.

As a result of this December 2015 incident, Sherilyn filed for a protection order in Washington and it was granted; Patrick acknowledged this. As part of that protection order, Sherilyn was granted custody of Dillen and Colten. This resulted in Sherilyn keeping the boys longer than the Nebraska temporary order permitted. On cross-examination, Sherilyn was questioned extensively about the misrepresentations she made on her application for the Washington protection order. She had marked "No" in response to whether she was aware of any other court case involving the children. Sherilyn's explanation was that she thought it meant

whether she was aware of another court case in Washington. She acknowledged that by that time, her divorce case in Nebraska had been going on "more than a year." When asked why she checked a box indicating that Washington had exclusive jurisdiction, she said she thought that was the case since she was in that state. When asked why she marked the box stating that the children's home state declined to exercise jurisdiction on the grounds that Washington was the more appropriate forum, Sherilyn said, "I don't understand what boxes I marked or didn't mark." She said, "I don't have a law degree. I filled them out to the best of my knowledge and understanding." Sherilyn agreed that as part of that protection order, she had initially requested custody of all five of the boys. She said she "was confused," and the court later corrected the order to give her custody of the three boys that are her biological children.

According to Patrick, after receiving the restraining order, he participated by telephone in a hearing on January 8, 2016, "and we determined at that time that Sherilyn had lied on some of the court documents in Washington." Sherilyn did not return the boys to Nebraska until January 14.

There were clearly two different versions provided to the district court as to what happened in Washington in December 2015. And there is no question that Sherilyn failed to provide accurate information to the Washington court when seeking a protection order, at least with regard to her failure to disclose that there was a divorce action pending in Nebraska, and that a temporary custody order had already been entered. Given Sherilyn's lack of veracity in that regard, and deferring to the district court as to issues of credibility, we cannot say the district court abused its discretion by believing Patrick's version of the incident over Sherilyn's version, or in disregarding the boyfriend's testimony.

As for the other incident (April 2016) in which the court found no domestic intimate partner abuse, Sherilyn claimed she and Patrick argued, apparently over a woman who showed up when Sherilyn was retrieving her vehicle (a Suburban) from Patrick. While Sherilyn was sitting in the driver's seat of the Suburban preparing to drive the vehicle away, she said Patrick came in from the passenger side and "put his hands around my throat and tried to strangle me." She said he then got into another vehicle and drove towards where she was "in the alleyway," which she perceived as an attempt to run her over. As he was driving towards her, Sherilyn said she "pounded on the window" and that made Patrick angry, and he "flew open the door" and grabbed her again, threw her against a fence, and then walked over and kicked her "in the gut three times." At that point, a "man across the way," and the police showed up.

Patrick provided a different version of how the events of the April 2016 incident unfolded. He claimed a female friend was in the passenger seat cleaning "stuff" out of the glove box and center console of the Suburban, when "Sherilyn assaulted [the friend], slammed her hand in the door or in the center console and then . . . grabbed ahold of [the friend] by the sweatshirt." Patrick said he went to the driver's side to reach in and "remove Sherilyn from [the friend]." As Patrick then walked down the alley, Sherilyn's brother (Marcus) was walking up the alley screaming at him, using foul words, and he "spit on me with his speaking." Patrick got into his minivan, backed it out of the driveway, and went forward in the alley. He could only "go forward one car length" because his friend's car was parked there. He claimed that he could not have tried to run over Sherilyn with the friend's car parked where it was. Patrick said he had already stopped his vehicle when Sherilyn got in front of him and pounded on his windshield. When Patrick opened the car

door, Sherilyn fell backwards, but Patrick said not because he pushed her backwards or because she made contact with the door. He went to help her up but "she was screaming so hard at me," he got back in his vehicle. Patrick said he was acquitted in a jury trial of criminal charges stemming from this incident; however, he did acknowledge that a domestic abuse protection order was entered against him.

Again, we cannot say the district court abused its discretion in deciding this event did not constitute domestic intimate partner abuse. There was evidence that both parties behaved aggressively towards each other or third parties. However, regardless of whether this particular event should have been designated as an incident of domestic intimate partner abuse, the court properly imposed limitations on the parties intended to adequately protect either party from such harm in the future, which we will discuss in more detail later.

As to Sherilyn's remaining allegation of abuse by Patrick towards her, the district court concluded the evidence did support Sherilyn's allegation that Patrick caused her to fall down the stairs and hurt her thumb. Sherilyn testified that when she had been in Washington and returned to Nebraska, while in the home, Patrick "threw [her] down the stairs." (This was later clarified to be after the second time she returned to Nebraska, which we note was in January 2016.) Sherilyn testified that she said something to Patrick that "set him off," and as he headed down the stairs, he shoved her and she fell and hurt her thumb. She said she did not call law enforcement because she "didn't really understand the law." Patrick testified that he and Sherilyn had a "confrontation" and he walked up the stairs "which is only about four or five steps." Sherilyn followed him and was standing in the "lower foyer of the stairway." Patrick told her he loved her and went back down the stairs to "give her a big hug." "In the process of the big hug, both of us fell to the floor." The district court did not find Patrick's explanation credible, and concluded that pursuant to § 43-2932, Patrick had committed domestic intimate partner abuse by a preponderance of the evidence.

As for allegations of abuse related to the children, the district court found that Patrick's practice of "bopping" the children as a disciplinary measure was inappropriate but did not constitute child abuse or neglect. Dillen's and Colten's biological father (Marcus) testified that before Sherilyn and Patrick separated, Marcus saw the boys "[f]requently on weekends." After they separated, Marcus actually lived with Patrick for about 6 months in 2012 while Sherilyn was in Washington. Marcus never saw Patrick hit either of the boys. However, he witnessed the "bopping," which he described as using a middle knuckle to strike the boys in their temple. Marcus saw Patrick use that as a form of discipline 2 to 3 times a week. He also saw Patrick stand the boys in the corner for discipline, and throw them in a cold shower, "with Dillen mostly." Patrick acknowledged standing children in the corner for discipline, but not using a cold shower. But he said, the corner does not work well with Dillen; rather, "You've got to talk to him." When asked if he ever "bopped the boys on the head before," Patrick admitted he used to use his fingertips or knuckles "on the top of the head" as a form of discipline. However, he also testified that "[t]he whole bopping thing, that is so old news, that is ridiculous. I haven't been with any of the other family members for three years." Patrick said he was "bopped" when he was a child, "and that's probably where I got it." But while it works for a little while, "you got to grow as they grow and you get out of it."

Sherilyn testified about her three biological children, noting that Griffin was "easy going," but that "Riley's behavior was hard." As a result, Sherilyn said Patrick did not know how to deal

with that. Patrick would, for example, "try to find a creative way of punishing him." In one instance, he did something on the trampoline, and in another, he shaved Riley's head completely bald, "that was his form of punishment to humiliate him." Or he would ground Riley from food late at night. With regard to her oldest son, Harrison, Sherilyn said they were at her sister's house when Harrison said something inappropriate towards Patrick, he "called him a Nazi or something like that, and so Patrick chest bumped him really hard and knocked him over on his butt." Harrison was 9 years old at that time. Harrison testified (age 18 at trial), and confirmed this incident.

Sherilyn also testified about another time when she and Patrick were in the kitchen, and Harrison, again about age 9, was very angry and "came down the hall at Patrick." She said Patrick had a frying pan in his hand, and when he turned "to whack Harrison," "Harrison blocked it, hit the wall, caused some big scar on the wall." Harrison testified that Patrick tried to "egg" him on, so Harrison went at Patrick aggressively. He said that Patrick "tried to assault me with a frying pan. In which case my mom did get involved, hit the wall just above my head." Patrick said the incident was "a little foggy," but "I do know that Harrison attacked me for whatever reasons." He recalled that he was facing Sherilyn and then turned around "as Harrison was hitting me. And I believe that Harrison knocked the pan out of my hand and it hit the wall." Harrison acknowledged that he and Patrick have had a "difficult relationship," and when asked if Patrick had ever hit him, Harrison said only that there had been "some close calls."

Sherilyn also said that Harrison "suffered from narcolepsy," and Patrick "would call him lazy, worthless piece of shit. These are texts that he would send to Harrison." Sherilyn said this was one reason she left; she felt he was abusive to her children. Based on these instances of Patrick's treatment of Harrison and Riley, Sherilyn was concerned about his ability to parent Dillen and Colten.

With the evidence set forth above in mind, we now consider the law applicable to allegations of abuse when determining custody of children. Section 43-2932 states in relevant part:

(1) When the court is required to develop a parenting plan: (a) If a preponderance of the evidence demonstrates, the court shall determine whether a parent who would otherwise be allocated custody, parenting time, visitation, or other access to the child under a parenting plan: (i) Has committed child abuse or neglect; (ii) Has committed child abandonment under section 28-705; (iii) Has committed domestic intimate partner abuse; or (iv) Has interfered persistently with the other parent's access to the child, except in the case . . . (b) If a parent is found to have engaged in any activity specified by subdivision (1)(a) of this section, limits shall be imposed that are reasonably calculated to protect the child or child's parent from harm. . . .

. . . .

(3) If a parent is found to have engaged in any activity specified in subsection (1) of this section, the court shall not order legal or physical custody to be given to that parent without making special written findings that the child and other parent can be adequately protected from harm by such limits as it may impose under such subsection. The parent found to have engaged in the behavior specified in subsection (1) of this section has the burden of proving that legal or physical custody, parenting time, visitation, or other access to that parent will not endanger the child or the other parent.

When a parent's commission of one of the listed actions in § 43-2932 is established by a preponderance of the evidence, the court must make a determination to that effect. See *Flores v. Flores-Guerrero*, 290 Neb. 248, 859 N.W.2d 578 (2015). Such a finding, in turn, obligates the court to impose any necessary limitations on custody, parenting time, and visitation and to make specific written findings prior to awarding legal or physical custody to the parent who committed the listed action. *Id.*

It is evident that § 43-2932 is designed to protect a child and/or a child's parent from potential harm by the other parent as a result of that other parent's past harmful conduct. The statute specifically tasks the court, when developing a parenting plan, to impose any necessary conditions on custody, parenting time, or other access, so that the child and parent can be adequately protected from harm by the other parent. In the present matter, this is precisely what the district court did. After concluding the preponderance of the evidence demonstrated that Patrick committed an act of domestic intimate partner abuse, the district court complied with the requirements set forth in § 43-2932(3). The May 23, 2017, journal entry contained findings pertinent to the allegations of domestic intimate partner abuse, and it set forth specific directions designed to protect the minor children and both parents from future harm; this language was also incorporated into the decree.

Depending on which version of the facts are to be believed, both parents in this case participated in inappropriate conduct in one fashion or another. The directives placed into the decree to adequately protect the parents and children from such future conduct were appropriate. Contrary to Sherilyn's assertion that the district court's custody determination was in "substantial disregard of truly concerning mental and physical abuse," we conclude the district court weighed the conflicting evidence, and after hearing and observing the witnesses, the court accepted one version of the facts rather than another. And after concluding there was some evidence of domestic intimate partner abuse, the court appropriately incorporated into the decree specific requirements or safety measures to avoid such incidents in the future. There was no abuse of discretion in the court's consideration of the custody factors set forth in § 43-2923(6)(d) and (e).

We now consider Sherilyn's argument that the custody factors contained in § 43-2923(6)(a) through (c) support granting physical custody to her rather than Patrick. These factors include the relationship of the children to each parent prior to the commencement of the action; the desires and wishes of the children if based on sound reasoning; and the general health, welfare, and social behavior of the children. In considering these remaining factors, we once again begin by setting forth the district court's view of the evidence.

In addition to the findings set forth previously, the district court found that Patrick "has demonstrated a greater degree of stability than [Sherilyn]." Also, in addition to her absences from Nebraska, Sherilyn acknowledged not being current on her child support obligation. The court found that the parties should have joint legal custody, but that Patrick should be awarded primary physical custody, and the parenting plan submitted as exhibit 12 was in the best interests of the children. Specifically,

> The Court considers the relationship of the minor children with [Sherilyn's] older children and with their biological father. The Court finds that the parenting plan as set forth in Exhibit 12, provides adequate opportunity for the minor children to maintain such relationships while they are in the care of their mother. Further, [Patrick] has expressed

support for the minor children's continued relationship with their biological father. The Court finds that the parenting plan set forth as Exhibit 12 should be approved.

Sherilyn argues that her bonds with all five of her children, along with the bonds between the children, "should have weighed much more significantly" in the custody decision. Brief for appellant at 15. She points out that because Dillen's and Colten's biological father is her brother, she had a relationship with the boys before her relationship with Patrick developed. Sherilyn suggests that it will be "solely up to [her] to ensure that the boys continue[] to have meaningful contact with those who are, in essence, their brothers." *Id*. at 14. At trial, Harrison also discussed his opinion about keeping the boys together, that it was important "for them to remain close to their family," and that their mother "gives the boys the love and attention that they seek."

It is evident in the findings set forth above that the district court considered Dillen's and Colten's relationship with Sherilyn and her older children, as well as their relationship with their biological father. Notably, when considering the allocation of overnight parenting time, the schedule approved by the court provides Sherilyn with 6, and Patrick with 8, overnight parenting days in each 14-day period of regular parenting time. This "8/6" parenting time schedule allocates almost 43 percent of the regular parenting time to Sherilyn. As noted by the district court, this parenting time schedule should provide an adequate opportunity for the boys to maintain their relationships with Sherilyn's older children, as well as their biological father.

With regard to the general health, welfare, and social behavior of the children, Sherilyn suggests "there was no evidence that the children preformed [sic] demonstrably better in school or other important aspects of their lives while in the care of one parent or the other." Brief for appellant at 16. However, as noted by Patrick, since Dillen and Colten were adopted, he has been the one to provide most of the parenting due to Sherilyn being in another state for large periods of time. Sherilyn "was not available to partake in the day to day needs of the children." Brief for appellee at 10. Sherilyn argues that "both Patrick and the district court failed to appreciate that the divorce was a fundamental turning point in Sherilyn's life and the move to Washington was done solely with an eye to furthering her education and providing a better life for all five (5) of her children." Brief for appellant at 16.

As to the reasons for her moving to Washington on two separate occasions, Sherilyn testified that she moved to Washington in 2012 because she did not feel like their marriage "was going to work out in a positive way. His behavior. He was really angry. And I was afraid where it was headed. And especially towards Harrison." Sherilyn felt Patrick "was very abusive" towards Harrison and that she "had to protect him." Sherilyn did not take Dillen and Colten at that time because she did not believe she "could take them legally." Sherilyn explained that she moved to Washington in 2014 because "Harrison was offered a very unique school that not everyone can get in, and it was a lottery system." She felt "it was in the good interest of Harrison," and she was also accepted "into a prestigious radiology program." She did not take Dillen and Colten at that time because there was already a temporary custody order in place. Patrick testified that during times when Sherilyn was in Washington, she did not have very much contact with the children. Also, he said Sherilyn provided support "when she absolutely had to," but had not made a child support payment since January 2016.

Daniel Haycock testified that he had known Patrick for 25 years, and he lived with Patrick, Dillen, and Colten from May to September 2015. During that time, he personally observed Patrick getting the boys up in the morning, getting them dressed, feeding them breakfast, and transporting them to school. He saw Patrick play with the boys outside on the trampoline and riding bicycles in the driveway. He described various outings with Patrick and the boys, along with day-to-day activities, and described Patrick as "an observant father, a loving father." Haycock never observed the boys with Sherilyn or any interactions or involvement between the boys and her, because the entire time he lived with Patrick, she was not there; she was living in Washington. Haycock said he had children of his own, and he has had Patrick watch them and "he did a great job."

Sherilyn suggests "Patrick's characterization of Sherilyn as 'unstable' is curious in light of the rampant insecurity in his own household." Brief for appellant at 17. She points out that Patrick "moved three women into the home ostensibly as 'nannies' who cared for the boys while also helping keep-up the house." *Id*. However, Patrick explained at trial that Dillen is autistic, a diagnosis made after four or five hours of testing at the "Monroe/Meyer Institute." Patrick uses a nanny to help provide care for the children because Dillen "does not function well with new people," so Patrick chose "to keep them in the home where [Dillen's] more comfortable." The nanny picks the children up from school and brings them home, but Patrick is home every evening to feed them, make sure they shower, and get them to bed. The nanny takes care of the boys for up to 3 hours a day, and she and Patrick split cooking and cleaning the house.

Sherilyn also expresses concern about Patrick having difficulty managing Dillen. However, at trial, Mike Heckenlively, a licensed mental health practitioner, testified that he became involved with the parties in September 2012. He worked with Dillen and the family for about 6 months at that time. When working with them, Heckenlively "was in the home," 3 to 4 times a week initially, and then 2 to 3 times a week "towards the end." It was an "intensive outpatient program," and "it ended successfully." Heckenlively said Patrick "listened well in sessions," and "[s]eemed to implement the techniques we talked about in the home and interacted with the children well." According to Heckenlively, Sherilyn was involved a couple times in the beginning, but she had already or was in the process of moving to Washington, so she was only there 2 or 3 times at the beginning for maybe a couple of weeks. He diagnosed Dillen with oppositional defiance disorder, which he acknowledged would make him a difficult child to control. Heckenlively worked with Dillen on learning coping skills, social skills, and reducing physical aggression.

Sherilyn claims the evidence "clearly favored primary physical custody being awarded to [her] as opposed to Patrick." Brief for appellant at 22. She compared her "loving, safe environment" to Patrick's "violent, degrading place that featured a revolving door of 'nannies.'" *Id*. Whereas, it was Patrick's opinion at trial that Sherilyn sought protection orders "to make [him] look bad so that she could obtain custody of the boys." When asked why he was "fighting so much" for these children who are not his biologically, Patrick stated, "They're my boys. . . . I've raised them. . . . Plain and simple, they're my boys. I love them. I adopted them to be their parent, not to run away."

As is often the situation in custody cases, the record contains evidence of positive and negative facts related to each party's behaviors and parenting ability. It is understandable that Sherilyn would view the evidence as favoring her, no differently than Patrick would view the evidence as favoring him. Based on the record before us, we cannot say there is such a disparity

between each party's favorable and unfavorable evidence as to render the district court's decision an abuse of discretion.

*Refusal to Hear Testimony From Minor Children.*

We now turn to Sherilyn's final assigned error which involves the remaining factor identified in § 43-2923(6)(b), regarding the desires and wishes of the minor child in custody and parenting decisions.

Near the end of trial, Sherilyn sought to introduce testimony from Dillen and Colten, in camera. Sherilyn's attorney argued that despite their young age, their testimony would be helpful with regard to "the area of violence" and the type of care Patrick provided the children. Patrick's attorney expressed concern about Dillen (age 9) testifying in light of his autism and other possible limitations. An argument was also made that putting Colten (age 8) in a position to have to testify against either parent was not appropriate. The court stated:

> Well, I realize Dillen is close but given that Dillen - I don't think Colten at eight is - I think that's too young. And then Dillen with his autism, I think there's been testimony that communication with him, you need to have a special style. I don't feel it's appropriate. Even though he's close to ten, I'm going to overrule the request for an in camera interview at this time.

The court asked if Sherilyn's counsel wished to make an offer of proof, to which counsel stated it was anticipated that the boys would say Patrick bops them on the head and "I think" their preference would be that they would like to live with their mother, "but I don't know that I can really make that type of offer of proof without their testimony." The court stated, "I'll take that as your offer of proof."

Sherilyn argues on appeal that the district court "adher[ed] to an arbitrary age limit set by the court for witnesses that was in direct conflict with Nebraska law." Brief for appellant at 23. However, the law on this issue, as set forth next, supports the district court's decision.

When determining custody and parenting arrangements, a court shall consider the best interests of the children, which shall include consideration of "[t]he desires and wishes of the minor child, if of an age of comprehension but regardless of chronological age, when such desires and wishes are based on sound reasoning." § 43-2923(6)(b). While the wishes of a child are not controlling in the determination of custody, if a child is of sufficient age and has expressed an intelligent preference, the child's preference is entitled to consideration. *Vogel v. Vogel*, 262 Neb. 1030, 637 N.W.2d 611 (2002). In those cases where the child's preference was given significant consideration, the child was typically over 10 years old. See *id*. Children of the parties to a marriage dissolution proceeding are not by that fact alone rendered incompetent as witnesses, but whether it is reversible error to hear their testimony depends upon the circumstances of each case. *Id*. In *Vogel*, disallowing the testimony of the minor children, ages 11 and 8, was not reversible error.

Whether or not to allow a young child to testify in his or her parent's divorce trial is a fact-specific inquiry and depends upon the circumstances of the case. See *Vogel v. Vogel, supra*. Contrary to Sherilyn's assertion that "the court imposed an arbitrary 10-year minimum age requirement to provide testimony in custody proceedings," brief for appellant at 23, we view the district court's position on this issue differently. As noted above, Nebraska case law has

demonstrated that typically a child has been over 10 years of age when such testimony has been given significant consideration. Therefore, using the 10-year mark as a starting point for considering other factors is certainly reasonable, and that is what the district court did in this case. In addition to the age factor, the court also had concerns related to Dillen's autism. The court pointed out that testimony during trial indicated that communicating with Dillen required a "special style." The evidence supports this concern. Patrick testified he used nannies in his home for child care instead of taking the boys to a daycare facility because of Dillen's autism, noting that Dillen "does not function well with new people." Marcus claimed that with Dillen's autism, "you have to get down and talk to him as a child or with him back and forth, otherwise he just freaks out." A licensed mental health practitioner diagnosed Dillen with oppositional defiance disorder, saying this would make him a difficult child to control, and this required working with Dillen on learning coping skills, social skills, and reducing physical aggression. And even Sherilyn's oldest child, Harrison, testified that Dillen "needs to be approached a certain way in order for him to communicate effectively." The district court's reluctance to elicit testimony from a child under these circumstances was a proper exercise of its discretion.

Also, based upon the offer of proof, Sherilyn's counsel sought to elicit testimony about how Patrick "bopped" the children on the head as a form of discipline. This matter was addressed by multiple people, including Patrick, and would have been cumulative and unnecessary. As for testimony regarding any preference on custody, the very young age of the boys would have made such evidence minimally relevant. Even assuming they may have testified to a preference for living primarily with Sherilyn, the district court would have considered that only as one factor in the totality of the evidence adduced. Given that the district court focused on Sherilyn's extended absences from the children's lives and the greater stability afforded by Patrick, these are matters upon which such young children would not have sufficient maturity to provide any relevant insight. See *Krohn v. Krohn*, 217 Neb. 158, 163, 347 N.W.2d 869, 873 (1984) (trial court "wisely exercised" discretion by declining invitation to interview children in chambers; "the young and impressionable age of the children would entitle any expression as to their preferred living arrangements to little, if any, weight").

A trial court has the discretion to determine the relevancy and admissibility of evidence, and such determinations will not be disturbed on appeal unless they constitute an abuse of discretion. *Gallner v. Larson*, 291 Neb. 205, 865 N.W.2d 95 (2015). We find no abuse of discretion in the district court's refusal to hear testimony from Dillen and Colten.

## CONCLUSION

For the reasons stated above, we affirm the district court's decree entered June 27, 2017.

AFFIRMED.